Case number 20-1190 et al. AT&T Services, Inc. Petitioner v. Federal Communications Commission and United States of America. Mr. Nechterlein for the petitioner's joint issues, Mr. Redish for the petitioner APCO, Mr. Carr for the respondents, Mr. Wright for the interveners. Mr. Nechterlein Good morning. I'm John Nechterlein for AT&T. The FCC had an opportunity in this order to get everything right. It could have opened up the 6 gigahertz band for Wi-Fi while protecting public safety, the power grid, and other license uses. Specifically, as the NPRM itself proposed, the FCC could have required all unlicensed devices that share spectrum with fixed microwave links to use automated frequency coordination, also known as AFC. An effective AFC mechanism would minimize interference risks by keeping these devices from transmitting on the same frequencies as nearby microwave links. So why did the FCC ultimately choose not to require AFC for so-called low power devices? It is a mystery. You'll find nothing in this order stating that AFC would have added significant costs to these devices. Indeed, the FCC identified no drawbacks to the use of AFC, which it called simple and easy to implement and did impose for standard power devices. It's also unclear what the FCC is saying now in response to this point on appeal. Is the FCC saying that AFC is always unnecessary on the ground that even without it, none of these billion-odd devices will ever harm any of the nation's 100,000 microwave links over the coming years? Well, the FCC seems to shy away from that proposition in its brief. That's probably because the order focused on a different question, whether problematic interference scenarios are So is the FCC admitting now that it is likely that some of these devices will harm some microwave links, but only on occasion in unpredictable places and times. If that's the case, then the FCC had no defensible basis for ignoring calls to equip all these devices with AFC, which would avoid these. Mr. Nicknall, I have kind of a big picture question. Could I ask you just to step back from this particular argument about frequencies? And here's my question. As I read your brief, most of your major challenges in here, the one you're now making about automated frequency control, your challenges to the Cable Lab study, to the adjustments the commission made to the AT&T study, and to all the requirements that they imposed on low-power devices, things like indoor operation, contention, all that stuff. All these challenges seem to rest on your claim that the commission believed its order would eliminate all risk of harmless interference, all risk. And if that were right, I think you'd easily win. But the commission says that's not what it did. They said the order is designed to eliminate the risk of significant interference, not all interference. They say, quote, harmful interference will be a rare but possible occurrence. So if the commission's right about that, how can its order be arbitrary and capricious? Or asked another way, I didn't see anywhere in your brief where you argued that the commission's order would not, in fact, eliminate the risk of harmful interference. Did you see my point? I think so, but let me distinguish between three different propositions. One is the very aggressive proposition that sometimes the order seems to be making, then the government did make in its response to the stay application, but now seems to have retreated from. And that would be the argument that there is no significant risk that at any point any of these devices will ever cause harmful interference to mission-critical microwave links. If that proposition were true, then you're right, we would have a more difficult argument. But that's not what we're arguing. We're not arguing that there's a small risk, but only an insignificant risk, that at some point in time, some of these billion-odd devices will cause interference with some microwave links. We think, and we show that it is very, very likely that at some point over the next 10 years, some of these billion-odd devices will interfere with some of the 100,000 microwave links. And we don't know what the government's position is on that proposition. The commission's response to that is that that's not what they were intending to do. The commission's response to this is that the order will reduce the risk of significant interference, and that if it occurs, the commission has the legal authority to stop it. Well, what the commission said, actually what the commission said is very unclear. Let's assume that the commission acknowledged that sometimes over the next 10 years, there will be episodes of harmful interference, but they will be the exception rather than the rule. If that is their position, then our response to that is, well, why not impose the remedy that you called simple and easy to implement to foreclose the possibility of those harmful interference events from occurring? We also pointed out that these post-hoc remedies that the commission talks about are not useful in the case of these microwave links. It's one thing in the American Radio Relay League case to say, well, if you're a dissatisfied ham radio hobbyist and you're experiencing interference from your outdoor broadband or power line system, then we can talk to the power line company about reducing that. It's very different in this context where we're talking about links that at a second-by-second basis are responsible for preserving the integrity of the power grid, for preserving communications among first responders. When one of these links goes down, the harm for that day is already done, and there will be 911 calls that won't go through. There will be failures to communicate with nuclear power reactors. That's the concern that we have here. Again, all of these concerns could be mitigated significantly by imposing this AFC requirement. Ultimately, the FCC, you will look in vain throughout the order, and for that matter, throughout the government's brief to explain why didn't the FCC impose AFCs for these devices. It never said it would be too expensive. It never said it would impose delays that would make these devices unuseful for their intended purpose. Now, I expect that interveners will make arguments like that. I will disagree with them, and I'll point to places in the record where we think that's disproved, but the point is that you'll find nothing in the order where the FCC actually addresses any of those issues. If they addressed it in the notice of proposed rulemaking, would that make a difference? Well, what they proposed in the notice of proposed rulemaking was exactly what we're seeking, which is to impose an AFC requirement on all devices that operate on the same frequency bands as fixed microwave links. So, in a way, it compounds the mystery. It's not just that we proposed AFC for all devices to share- I thought that was not in all the sub bands. I thought in the notice of proposed rulemaking at JA 199 paragraph 61, FCC said something to the manufacturing of unlicensed devices that are too complex and that are unnecessarily expensive. That's a paraphrase, not an exact quote. If they had said something to that effect, would that be enough? Or would you come back and- Sorry, could you give me that JA slide again? JA 199 paragraph 61, I think. Yes, we believe our- Oh, so that's a different set of issues. What was unfeasible for there is that, remember there are these two sets of sub bands within the six gigahertz band generally. The sub bands that I'm here talking about today, because I represent fixed microwave operators, are the sub bands where the fixed microwave links operate. In this paragraph, the NPRM was referring to other sub bands used by the broadcasters for mobile microwave operations. In that context, you are correct. The FCC found that an AFC requirement would not help protect truly mobile broadcast operations because there's no way for a database to keep track of where all these mobile transmitters and receivers are at any given moment. That may well be true. NAB has a separate set of done for its sub bands. But again, I'm here and Mr. Reddish is here to talk specifically about the sub bands that the FCC was not referencing. Can you tell me where in the NPRM they said they would apply AFC within your bands for low power transmitters? I know they did it for standard power. Correct. You don't have it right now. You can tell me. I do. What we see on JA185, if you look at the table, the bands that AT&T and APCO and others are concerned about are fixed 1 and 3 in the chart on JA185. Those would be standard power access points. They would all have been accompanied by AFC. They required AFC for everything that's standard power in the rule. They didn't require AFC for standard power devices. In the order they did require AFC for standard power devices, but they did not allow these low power devices or they would not have, they have followed through on the NPRM. They would not have allowed these non-AFC equipped low power devices to have operated in the sub bands used by fixed microwave links. That's the important point here. Okay. I misunderstood you earlier. I thought you said they had proposed AFC for both standard and low power other than in those two bands. I misunderstood you. No, I'm sorry. What I observed was that the FCC would have imposed AFC for any unlicensed device that shares spectrum with fixed microwave links. That's what we're seeking here as well. I have a, well, were you going to continue on that topic? No, I have another question, but you go ahead. Well, why don't you go ahead? You ask your other question. I'll come back. Mine's just a practical one. I'm trying to figure, you talk about, I have two questions about this. One is you talk about, look, at some point there's going to be a statistical thing, but at some point in your theory, there is going to be interference. What is your timeframe when you say that? You say it repeatedly in your brief that it's going to happen, but I never know what your timeframe is because your timeframe is yearly or monthly. That's one thing. If your timeframe is every hundred years, it's a different thing. Well, that is plainly not the timeframe. The timeframe is the useful life of these devices, which are coming onto the market now and which will pose threats to these fixed microwave links for the years to come. Now, I mean, each of these devices presumably has a different estimated lifespan, but as long as these rules are in place, none of them need to use AFC, even though they're operating on the fixed microwave frequencies. Your point was, look, they're dealing with statistics. We're telling it's going to happen. They aren't foreclosing. Without AFC, it's going to happen. Maybe on the low end of the statistical analysis, at the low end of the bell curve, it's going to happen, but I never got a timeframe. That's really, I should think, influence. I don't know what the lifetime of these devices are. It could happen often today. Once these devices flood the market en masse, now, the FCC told the court last year that it was early days in the production distribution of these devices, so the court didn't need to worry about issuing a stay until after this case had been briefed and argued. I'll take them at their word, but they are coming onto the market now. What we showed, what CTIA and AT&T showed in the record, and there are full-color examples, and CTIA is a case essentially taken at random from the first 25 entries in the FCC's own database, showing clapboard houses of the type that you will expect to see these on licensed devices operating in across the street from mission-critical microwaves. That brings up my second question, and that is, what does it take? Is it really true that, say I lived in a house like that with a direct line to a transmission tower, and I put my router there in the window, is that one, let's just say that one router happens to click right onto the same frequency emitting from that tower, and it's also the 9-1-1 frequency. Will one little Wi-Fi router take down 9-1-1 operations, or would it require multiple points of access to have actual practical interference? No, one device is sufficient operating at these power levels without AFC to take down a microwave link, and there's unresolved evidence. One device, my little Wi-Fi router. Yes, absolutely. I mean, and we're not even talking about, we don't even need to talk about aggregate interference among many different devices. What we showed was that one device is sufficient to reach a microwave receiver. It's sort of like you're in a field, and someone from far away is speaking in a normal conversational voice, and you're trying very hard to listen to what they're saying, but there's someone much closer to you that starts talking loudly, and it becomes impossible for you to hear the signals that are coming to you from far away. Once that happens, the microwave link can go down. There's unrebutted evidence in the record that takes down the microwave link, not just for the split seconds of transmission that you find from these devices, but also as much as like 15 minutes while towers go down and networks need to re-sync. Those are 15 minutes. I'm not a technological person. How does it take it down? I would think there might be a burst of static, but as soon as it stopped, why wouldn't it just keep going? Nothing's physically breaking. It's a little bit like your Wi-Fi router at home. If the power goes out, then the Wi-Fi router has to boot back up. It has to re-sync with the network, and that takes, you know, that can take up to 5, 10, 15 minutes. So picking up on that same line takes it down like turning the power off as opposed to just a momentary static interference? There is unrebutted evidence in the record that it does, yes. It's not just momentary. It can take entire links down. The FCC never denied this. I mean, if you look at the order, we have pages and pages in the joint appendix where we make the claim that these split-second interference events can bring down networks, microwave networks, for minutes at a time. The FCC never disputed that in the order. I mean, more importantly, you know, your device isn't going to transmit just once. I mean, it's going to keep transmitting. It may not do it, you know, as much as it does when you download a high-def, when you watch, when you stream a high-def movie, but these devices are communicating with other devices in the house. They're sending out little beacons that say, here I am, here I am. If you want to connect to Wi-Fi, this is the address you should use. Those signals that are coming sporadically but constantly from these devices can continue bringing down that microwave link across the street. And then what do you do? I mean, the microwave operator doesn't know exactly what's happening. You can't triangulate where this is coming from, period, until somebody figures out which of the potential 10,000 devices within the vicinity of that microwave receiver is the one responsible for the interference event. Okay. Mr. Neff, I have a fact question too. It relates to the 2.4 gigahertz band in your arguments on behalf of the national broadcasters. You say that the contention-based protocol has not protected licensed users in the 2.4 gigahertz band. The commission says that the 2.4 gigahertz band rules don't require contention-based protocol. What are the facts here? Do they or don't they require it? I'm happy to address that. I want to just frame this by pointing out that this is an issue that's specific to NAB's separate arguments. So they don't apply to protecting. Yeah. Okay. So with respect to the 2.4 gigahertz band, those devices do use contention-based protocols. My understanding is that those protocols are not required by FCC rules, but it's an industry standard nonetheless. The difference is that they use them, but they're not required. That's it. Yes. Do you know what procedure... Do you know what... Do you have any... Is there percentage of them use contention-based protocol? I'm not aware of anything in the record on that. Thank you. That's all. Yeah. Okay. Well, I think we'll hear from... Unless my colleagues have any further questions for you, Mr. Nicholson, I think we'll go to hear from Mr. Reddish. Morning. May it please the court. Good morning. Mark Reddish for Petitioner, Petco International. The FCC changed its rules for spectrum that first responders depend upon for life safety communications. The FCC was warned letting unlicensed devices use the same frequencies as first responders will cause interference and block emergency communications. And yet in its order, the FCC did not address even basic public safety concerns, such as how long will it take to locate and eliminate interference? And how much harm will the public and first responders face while this is happening and emergency communications are blocked? The FCC didn't even explain why it wasn't requiring real-world testing before these new devices can flood the marketplace. There's no dispute that the FCC has an obligation to consider public safety in its rulemakings. In Mozilla, this described the law as requiring a focused and specific study of public safety implications. That did not happen here. The FCC does not claim that it conducted a specific study of public safety. And in fact, Mr. Reddish, this whole, unlike Mozilla, this whole proceeding was about allowing other devices onto a frequency that is dedicated, otherwise dedicated to safety and other sensitive forms of projects. The whole thing was about how do we prevent interference with those sensitive operations? And it seems like FCC said, here's how we think we can prevent it. Here's the things we've set up to prevent it. And there's a disagreement about whether they've prevented it enough or what they've proposed will prevent it sufficiently. But it's nothing like Mozilla because the whole game here, I'm going to diminish it by calling it a game, but the whole enterprise here was access to the bands that are already being used by public safety communications. It seems quite different to me. Your Honor, I'd offer two considerations. First, there is a key distinction here with Mozilla in that here, it's clear that we're talking about potential interference directly to general internet-based communications. Thus, you would think there'd be a heightened duty, more attention to public safety by the FCC. But in fact, all- Yeah, that's a different argument. There's an argument that they didn't consider it. That's what was going on in Mozilla. There's a separate argument, which I now hear you saying, and that is, well, a substantive argument about their standard or ruling that it's not safe enough. But that's different than saying they didn't consider it. That's simply saying we disagree with where they were going through the line. Your Honor, we are arguing that the FCC failed to consider public safety. The order was only considering technical issues related to the systems used by first responders. It was not considering the public safety harms like loss of life. And when public safety is involved, lives are at stake, and those harms are irreparable. If I may, I'm sorry, I see my time has expired. Can I make one more point about foregoing the analysis here? One more. That's it. So this case demonstrates the dangers of foregoing the focused and specific analysis that Mozilla calls for. Essential elements of the problem are overlooked. That happened here. For example, with regard to emergency special temporary authority, this is a special provision that lets public safety agencies bypass the usual spectrum licensing rules during major events like hurricanes. We just saw this with Hurricane Ida. The FCC missed this in its order, and only after the fact, in front of this court, did it admit the omission, and counsel attempted to minimize the problem and suggest that more than a week could go by during a disaster response without the ability to protect these specially authorized public safety communications, and that wasn't a failure to consider the public safety issues here. We understand your argument. Thank you. Thank you. We'll hear from Mr. Carr for the commission. Good morning, Judge Tatel, Your Honors. May it please the court, my name is James Carr. I represent the Federal Communications Commission. I'd like to start with the AFC point that petitioners were making. It is not correct that the commission proposed AFC for low power operations in those parts of the 6 gigahertz band where the fixed microwave links were. If you look at paragraph 73 of the notice of proposed rulemaking, joint appendix 202, at that point, the commission was seeking comment on whether it should allow indoor low power access point operations in the bands used by the fixed microwave links, and it specifically asked whether such operation could be authorized without the use of an AFC system. It never proposed to use an AFC system with respect to those low power devices, similar to what it proposed in the other bands where the broadcast mobile operation. Okay, so you asked for information on that question, and you got plenty of comments, including those from petitioners saying you should use them. If you need to use them, you must use them, whichever verb they wanted to use. Where, can you please, this is the thing that's been bothering me from beginning, where on the record do you address those comments and explain why you're not requiring AFC? I think the commission basically found that AFC was not necessary because there was no finding that because we find no significant risk, AFC is not required. Where did you respond and then respond to their comments? If you look at paragraph 98 of the commission's order, joint appendix 1299, the commission says, based on the record before us, we open the entire six gigahertz band for AFC controlled access. Right, that's a description of what you've done. I don't think there's any dispute that you've opened it up without AFC. Where do you answer their arguments? And we said at paragraph 99 that there would be no AFC system, and we took three other steps, three restrictions designed to prevent harmful interference, that devices be limited indoor operation. I'm not AFC that they said that will protect even better, every device will protect against every device. Right, you said statistically we'll get, statistically we'll knock off most of the devices, but they said AFC will protect against all devices. Where is your answer to those comments? I guess you say we're not doing AFC, I guess you say that, but where's your substantive response to these important comments? Your honor, that the, what the commission says in 8 and 99 is essentially the commission's response, which is that the commission believes that even without an AFC system, there is no need for harmful interference. I would point, I would point out also this, I'm sorry, I couldn't hear the, I'm sorry, I would point out, the petitioners point to language in the NPRM that AFC would be simple and easy to implement. Well, the commission has found, even with respect to standard power access points, that AFC is not particularly simple. If you go to paragraph 42 of the order, it describes how geolocation technologies, this is joint appendix 1279, geolocation technologies such as GPS do not work at locations deep within buildings. And this was a problem for these standard power access points. They had to develop external sources in order to make AFC work. It was a more complicated operation for standard power operations than the commission had anticipated. It would be even more complicated if you were talking about adding this requirement with respect to mass-produced, mass-marketed, low-power access points, consumer devices. Just because there are so many of them. Why is that? I just don't know. This is my complete ignorance. Are these bulky things you can put on small devices? Are they too expensive and manufacturers couldn't just build them in? I just don't know. I don't have anything. Fair enough, your honor. As the commission explains in paragraph 42, you need an external geolocation source to be connected to an access point. Either a wired or wireless connection. Because if they're being used indoors, it's hard for the AFC to track them. The whole point is when they're used outdoors. These are being used indoors. That's the whole point. They're all being used indoors. They're designed to be used indoors. They say indoors can include right at the window, at which point they're going to be transmitting outside the building. This rationale wouldn't apply or would it still apply? We don't know because the commission didn't say. We don't know for sure. I'm assuming it might be easier to track if it were closer to a window. What paragraph 42 says, these are deep within buildings. In many cases, as you may know from personal experience, your wireless routers are often inside your homes. They wouldn't be easy to track. They're more effective next to a window. Fair enough, your honor. Yes, your honor. I have a couple of technical questions. Yes, your honor. First of all, my router is on all the time here. My phone's on. They're in constant communication. The cable lab study used a data set with an average activity factor of 0.4%. Can you explain to me how that... That suggests to me that the communication between the two of them is occurring less than 1% of the time. Is that right? Yes, that's right. How... I mean, my phone is at this moment receiving a signal from the router. Right? Is that it? I don't know, your honor, but I... You don't know? If you don't know, how am I supposed to know? I'm not an engineer, so I'm lost for much of this case. What I will say... Maybe Mr. Nectarline knows the answer. I don't think... I wanted to point out that figure was derived by... And Joint Appendix 662 is the ex parte where that data was submitted to the commission. It was taken by Broadcom from one of its customers that runs, that operates a network. I understand where it came from. I just don't understand it. So, technologically, I just don't get it. It's the best evidence in the record, given that it involves actual real world measurements of Wi-Fi activity. In the real world where I am right now, my cell phone has been in touch with my router the entire time of this award. I'll tell you, teenagers in the house, they got 15 devices going all the time. Yeah, see, I don't even have any teenagers. There is a phone, there is a watch, there is an iPad, there's a wireless laptop. Okay, so next technical question. I asked Mr. Nectarline about contention-based protocol in the 2.4 gigahertz band. And so, do now I understand that it's not required, but many of them used it, right? That's my understanding, yes. Is that your understanding? Well, the reason I asked the question is their claim is that there's been chaos in the 2.4 gigahertz band from which the commission has been unable to protect them. I'm sorry. Can I finish my question? Yes. Let me just finish. Your answer is, well, now we're going to have contention-based protocol, but according to you and Mr. Nectarline, both agree that contention-based protocol is used in the 2.4 gigahertz band. So, if there's contention-based protocol operating in the 2.4 gigahertz band, how does that give you any assurance that it will be better here in the new one? Do you see my point? Let me observe. I do see your point, Your Honor. The only evidence of what you described as chaos in the 2.4 gigahertz band is there's some anecdotal evidence. There's one example given of some interference in the Phoenix area of a mobile broadcast operations where the program coordinator, which is not affiliated with the FCC, it's a private frequency coordinator, identified the source of the interference and told the people operating the devices to stop using them. But at least according to the record, those device users turned on their devices again and created the same sort of Okay, I overstated chaos. I understand that. But where did the commission respond to the national broadcaster's claim that the commission has been unable to protect them in the 2.4 gigahertz band? Well, that was one isolated case they identified in the record, and as best I can tell from this description in the record, neither the commission nor its enforcement bureau were involved. It would notify the users of the interfering devices to turn them off, and it would also send them a notification, a letter saying that the devices should stay off until the harmful interference is resolved. And there's a description of how that 13 20. The commission cites a notification of harmful interference to Victor Rosario of Brooklyn, New York on in that notice. Basically, the commission told Mr Rosario we see that you were operating a device that is causing harmful interference. We told you to stop. We want to confirm that you have that it's that the device is still off. And if you turn it on again, and it continues to emit harmful interference, you could be subject to monetary forfeitures under Section 503 of the Communications Act and other enforcement measures, including so much is, you know, in extreme cases under Section 5 10 of the Communications Act, the offending device could be seized. So I think if if the commission had been involved in that, if the broadcasters had invoked the commission had had summoned the commission's Bureau, that problem would have been resolved. All right, my last technical my last technical question is, so the petitioners say that these low power devices that have content based protocol, that they can really they only detect each other. They don't protect point to point being transmitted by microwave towers. Yes. And, and, and if they're right about that, then this contention based protocol won't help that, right? Because, I mean, say you live in a building with a bunch of you live in an apartment building, and there's half a dozen routers, and the routers are all sensing each other. And only coming on what that means a router is going to be on all the time. And they say, they say, that's the problem. And these contention based protocols won't detect the point to point transmissions that they fear that they worry about from micro microwave towers. What is the answer to that? Let me say first of all that that contrary to I mean, petitioners have suggested that these unlicensed devices will never be able to detect the fixed microwave transmissions. And what the commission said in what note 374 or JA 1317 is that indoor unlicensed devices may not always be able to detect the presence of microwave signals. The FCC's engineers believe that in a number of instances, these these will be detected, but regardless of that, it isn't it pretty important to know how significant they may not always suppose they may not always have the time. The primary reason the commission adopted the contention based protocol was to limit the amount of time that these unlicensed devices would be transmitting so that no one would be transmitting continuously with a strong Mr. Right, but in an apartment building, where you have a couple of these, or many of them, maybe I'm misunderstanding this, but doesn't it mean that at least one will be transmitting all the time? I mean, at least one, not the same one? Well, well, different ones would be transmitting. But But again, if if if it is one particular device that is problematic, as opposed to another, then the problematic device would only be on for a short period of time. Part of the problem with this analysis is that it's particularly complicated in terms of there, there are so many different things that protect against harmful interference in this context. And the commission talked about there's building loss, there is clutter loss, there is a low activity factor, the fact that these devices aren't on all the time, there is the probability of co channel occupancy, the only way these devices are going to interfere is if they happen to occupy the same channel. And as the commission pointed out, in table six, joint appendix 1313. In many cases, there's less than a 10% chance of co channel interference or co channel occupancy. Another thing to keep in mind, particularly important is the strength of the signals. Normally, and this goes to what Judge But normally, normal circumstances, the transmission from a fixed microwave link is so powerful, that even in their worst case, the transmission from a low power access point is not going to be strong enough to cause what we know is harmful interference. That is to say, and that's, and that's a paragraph 143, where the commission discusses the phenomenon of deep atmospheric multipath fading. That's a that's a meteorological phenomenon. The commission says J 1317, paragraph 143, potential degradation of a microwave link will only occur if a deep atmospheric multipath fade occurs at the same time, the microwave receiver receives apologize, I'm not I think I'm missing I'm not the right but you said page 1313 1317. Before you read again, explain to me why that's the question we're talking about. Why is a deep what did you call it deep atmospheric what atmospheric multipath fade? Okay, why is that comparable to a low power router? Well, a deep atmospheric multi what a deep atmospheric multipath fade does is it's a disturbance in the atmosphere that causes the received signal from a fixed microwave? Yeah, link to lose power, it causes it to weaken the signal to weaken to the point where to the point where you can have degradation, you can have harmful interference from these on low power devices. But without without that, these, these devices, these indoor low power Wi Fi access points are not going to as long as they occur outside the fade and and the commission explained paragraph 143 that these fading events don't occur often. And they typically occur between midnight and 8am, which is outside the peak usage period for these. Okay, well over your time and let's judge Walker, I do have one. Oh, go ahead. Walker, you go, you go. Yeah, go ahead. It's one question, but it is rather long, Mr. Carr, just as a heads up. It seems that in ways, the FCC may have acted arbitrarily and capriciously. It seems like perhaps with regard to mobile microwave signals, you said that with the pre existing bands, there had been no problem, but you didn't cite any evidence to support your assertion. With regard to the AFC for the six gigahertz that we talked a lot about, it seems you described what you were doing instead of AFC, but you didn't say why AFC was not a better alternative. And this is very in the weeds, but there was a CII study that led to a letter from Edison in April, which was kind of a follow up letter. And there was no response to that letter. There was a kind of a footnote that you said what you had said before the letter. Now, if I'm wrong on any of those, I'm sure you think I am. Tell me why. And but but after that, tell me even if I'm right, why we should remand without vacated. Okay, let's start with the third scenario. First, you were talking about the CII study, Your Honor. That April letter that they cited, and I think the commission explained this in that April letter largely relied on a March analysis of prior to the commission's order being released. And the commission addressed all of the relevant points that had been had been raised earlier. The fact that... Go ahead, Your Honor. No, no, no, we're very late. I'd rather just listen. Okay, okay. With respect to your first point about not citing any evidence of no problems with interference in the 2.4 gigahertz and 5 gigahertz bands, I would say I mean, it's hard for the commission to prove a negative there. I mean, essentially, none of the parties have produced any evidence with the exception of that one isolated incident in the 2.4 gigahertz band from outdoor operations in the Phoenix area. So it seems to me those are examples where there are a multitude of devices being used in those bands and only isolated instances of harmful interference that have been effectively identified and addressed by the commission. I'm trying to recall your second point. Your second point was? It was that you described what you were doing instead of AFC for 6 gigahertz, but you didn't say why those were better than the alternative AFC. I've indicated in my responses earlier to Judge Blatt that the commission just basically said AFC wasn't necessary because there was an insignificant risk of harmful interference here. Again, I'm sorry. You had one final question about why we should remand without vacating. I know you don't agree. I don't think you should remand at all. If we conclude on those three, why are those three things not enough to require vacating? Well, as I've already explained, two of them. I don't know. Assume I disagree with you. ...responses on the AFC. This is a somewhat, Mr. Carter, this is a somewhat friendly question. I assume that I disagree with you, but I think that this is an instance where we shouldn't throw the whole order out and make you start from scratch. I see where you're coming from, Your Honor, and I appreciate it. We should just remand so that you can clarify some things that you should have addressed before. Tell me why that's what we should do. I think if the court is going to remand, that remand without vacator would be appropriate here because vacating this order would be incredibly disruptive given the fact that devices have already started to be deployed. And also, I think to the extent the commission is or the court is looking for further explanation from the commission, I think it's well within the commission's power to provide that explanation if in fact the court feels that further explanation is needed. Okay. Thank you very much. I just had one more question. Yes, Your Honor. And this, again, is just sort of a factual point me in the record. The Cable Lab study relied on a test of, I think, 500,000 devices in New York City. Yes, Your Honor. Which I would submit and maybe take additional notice of as an area with enormous building and external clutter, probably amongst the highest in the United States. On what basis, given the explanation point to me in the record, did the commission conclude that that was remotely representative of the risk of interference nationwide in dramatically different environments? Well, I think, Your Honor, I understand your point. I think the commission's view was that these access points were distributed throughout New York City. Now, there are certainly portions of New York City that are filled with buildings and clutter, as you put it. There are other parts that are more remote from the downtown and the Broadway area that are not as... New York City itself, there's areas that you would say don't have, maybe not as intense. There may be degrees of intensity. But my question, again, is how it's representative of the entire United States from someone who grew up in the Midwest. I grew up in the Midwest, too. So I think the commission's point... Did they not address that issue? Is that why you're... I'm not asking you to answer it. I'm asking you to tell me what they said and where. I don't think they really said anything directly about that. I think the commission said, given this probabilistic analysis, this was the best evidence the commission had in the record on the subject of the likelihood. Okay. So if an agency has a really, really important question to decide and 20 studies are submitted, none of which, all of which have flaws, none of which have statistical significance, or involve representative conditions for the nationwide type of determination the FCC has to make, is it reasonable or is it arbitrary and capricious for the agency to say, well, this is the least worst of them all. And I'm going to rely and make all kinds of projections based on that. Or should the agency say, we're the experts. We're going to either request better tests or do them ourselves. First of all, least worst seems a bad way to decide things. Normally, your honor, the commission doesn't conduct its own studies. It relies on the parties. I mean, I suppose what it could have done is it could have asked the parties for more evidence, but there were hundreds of studies submitted. Were any of them more representative than just New York City? And some of the studies, and the commission cited a couple and footnote 373 at JA 1317, Monte Carlo studies that assumed a large number of devices transmitting in the six gigahertz band and over a large region. ECC report 302 was focused on the entire European Union and the RKF report assumed 1 billion devices in its analysis of deployments throughout the United States. So, and they were consistent with those, right. And they reached and they reached conclusions consistent with cable labs that there was no significant risk of harmful interference. Thank you. Okay. Thank you. We'll hear from the intervenors here. Thank you, your honor. Mr. Wright. Thank you, your honor. And Christopher Wright representing the intervenors supporting the FCC. I'd like to start with the discussion of AFC. In paragraph 147 of the commission's order directly recognizes the claims of AT&T and CTIA and others that there ought to be an AFC requirement. What page were you? Paragraph 147, which is JA 1319. By the time you get to paragraph 147, the commission has of course said that it concludes that there's no significant chance of harmful interference a number of times. I have to skip over paragraph 148 where it starts. We also disagree with another contention of CTIA. And then the first sentence of paragraph 149 says we disagree with AT&T and CTIA's views about the likelihood of harmful interference. So as Mr. Carr said, it's very clear from this order that the commission did not adopt an AFC requirement because it thought there was a insignificant chance of harmful interference without one. And that's the issue before this court. Is there a number on insignificant risk? Insignificant risk could be 20%, 10%, 30%. Is there a number somewhere? Because when you're talking about health and safety, one would want a much lower percent. Well, the commission hasn't given numbers. And realistically, I don't think that's possible. It's defined harmful interference to require serious degradation, repeated interruption, obstruction, or endangerment. Well, obstruction doesn't have an adjective with it or an adverbial adjective. Well, this requires obviously more than interference and regular interruptions and that sort of thing. I think the commission is right in saying that it can identify harmful interference. And it didn't just throw up its hands and say the cable labs study is the least worst study. It took a very careful look at all of these studies and concluded that they show that there's an insignificant chance of harmful interference. Yet with respect to the cable lab study, I think the most important thing is that the commission has made clear that it thinks these worst case analyses aren't worth much, that a risk-based analysis is much more sophisticated. And yet AT&T just came in with worst case analyses. Why aren't they, though? Just help me understand because they sound pretty awful. If all some bad actor has to do is start pointing, take routers outside and start pointing them at a tower to disrupt 911, that's rather disconcerting. And even if it's only going to work 25 or 20% of the time, that seems a lot for safety. Your Honor, the evidence from my friend, Mr. Nektarline's client isn't even anecdotal. It's not even mostly something that happened. It's sort of we can sit here and think of a combination of 12 things that are all unlikely. But yes, it's possible they could all happen at once. And the FCC's engineers are quite sophisticated. And they start, actually, I believe, with your intuition that your little router is unlikely to bring down some powerful fixed wireless device. But it is technically possible if a whole lot of things happen at once. One of the things that has to happen is this deep fading event that Mr. Carr talked about that's discussed in paragraph 143. And I want to highlight that even though the commission said quite clearly that harmful interference will only occur if there is both an excessively high power transmission from an unlicensed device and a, quote, deep atmospheric multi-path fade, unquote. And the other side has just completely ignored that paragraph. They didn't mention it. So we mentioned it just to make that clear. And in their reply, they just ignored it again. So I mean, I think the petitions can be dismissed for that reason alone. The commission said that it thinks harmful interference will only occur if there's one of these deep fading events. And we've got nothing from the other side on that. Can I also ask you about the 0.4% activity factor? This must come from my ignorance. Because like Judge Teitel, I swear my kids are burning out the Wi-Fi every time they're awake, every hour they're awake. Here's how I understand it. It's like when you download a video, the video then is on for two hours. But it downloads in a burst. And with the new wide channels and the 6 gigahertz band, it's going to download in a really tiny burst. So you might be watching for two hours. But the connections were a matter of seconds or less. Okay, so does that mean? Let me just ask. Is that the answer to my question, though? So the router is always sending out a signal, correct? But that's not the signal that anybody's worried about. The signal that they're worried about is the time when the router is not just sending out its signal, but it's when it's sending, communicating a message. Is that right? Or do I not understand? Right. Well, let me try this way. It's not just because the light is blinking or something like that. That doesn't mean you talk, but your communications, your voice takes up so little. Isn't there a signal right now coming from my router to my phone? Probably not. Or it probably takes. My phone says I'm connected to my router. How does it know that unless it's receiving a signal from the router? But again, your TV is connected to something, too, and you're watching the video. The burden has occurred. Can I ask if this is how it works? Let's say that every five seconds, the router sends something to my phone, but it only takes it one one hundredth of a second to send it. So that would mean we're looking at one five hundredth of the time. I'm just making those numbers up completely, but that could get you to a number like point four percent. Right. Well, let me point out that while the petitioners have what I think of as a grumpy footnote in their reply brief that sort of says we don't really believe this, they're capable. This is AT&T and a lot of other big companies. They could do their own study. If there was some reason to doubt the zero point four percent, they could have put it in the record and they didn't. Okay. Can I ask? No, no, you go ahead. I was going to go about enforcement. And that is, you know, it's always talking about Phoenix, but that was different types of communications altogether. And the whole premise here is that just a legion amount of new devices and Wi-Fi devices are going to pour into the market, into the households, everything from toasters to doorbells to the stuff we're talking about now, phones, televisions and computers. How is enforcement possibly going to work if there actually is some happens? How is it possible? You're never going to be able to figure out. I mean, I guess they can't even come to the curtilage. They have to walk around the block looking for Wi-Fi routers and windows, or I just don't know how people can move it outside and then move it back inside. I don't understand how enforcement works here. I really don't. So again, you have to have this confluence of events, but, you know, petitioners nicely put some pictures in their brief of places where they thought sort of interference might occur and, you know, it won't take deep study to figure out, geez, we should look in that flimsy shed there. Or is there somebody on the patio after midnight for some reason? And again, you know what, by the time the investigators get there, unless you tell me they're just roving around, shining flashlights in people's windows, looking for routers. It's I just don't understand how it's going to work really in the way that it's going to be a router. Router police, Patty. Well, you know, the FCC has experienced tracking down pirate radio stations. And of course, they're trying to hide from the FCC. So somebody who goes out after midnight, you know, and takes their router outside, because that's the thing that would cause interference, not just a laptop. And, you know, they're not even hiding. So we're way over unless you have more questions. Okay, great. Thank you. Thank you, Mr. Wright. Let's see. Mr. Nectarline, you were out of time, but you can take two minutes. Thank you. First, I want to respond to the point that they didn't impose AFC because they found there was an insignificant risk of something. Focus on what the something is. They said there was no there was no significant risk of what they were ultimately saying is in the mind run of normal cases, there is an insignificant risk that a given router will cause a particular microwave link to go down. The FCC was always focused on that question, not on the one we're concerned about, which is whether over time in the trillions of interactions between these billion odd devices, 100,000 microwave links, whether it is likely and it's as indeed it is that some of these microwave links will be compromised. Number two, AFC is not particularly difficult to implement. The FCC is implementing it right now with respect to standard power devices. There are well accepted protocols for consumers to take their devices to Windows or to enter their addresses. Those will go 99% of the way towards resolving concerns of the type that we're here today to discuss. Again, the FCC never explained why it didn't impose the AFC requirement for these devices, even though it proposed in the NPRM again to use AFC for any device to share spectrum with these microwave links. Deep atmospheric fade. I'm glad that Mr. Bright brought that up. Fault says for not addressing it in our reply brief. Well, the FCC didn't address deep atmospheric fade in its own brief, and that's why we didn't feel the need to address it. And for good reason, the FCC didn't address it. It's because these fade events happen constantly. To be sure, they can be particularly bad between midnight and 8 a.m., but there was undisputed evidence in the record that they can happen any time of day. They can happen in very problematic ways in the morning if there's fog. It can happen at 10 a.m. at night. AT&T submitted evidence to that effect. The FCC never responded to that. And I would like to refer you to JA611 and 612, 644 to 647, 1236 to 37. I see my time is out. I had a couple of additional points. I'm sorry. Could you just say those page numbers again? Okay. So the I'm sorry. Yes. So if you look at 1237, also AT&T submitted an ex parte on this whole issue of fade that is not in the joint appendix, but it's available on the FCC's website and is part of the administrative record, is an AT&T ex parte letter dated August 8, 2019. Also, APCO addressed this issue in its comments, JA375, where it talked about fade events in the morning. The point is that these microwave links are precisely engineered, not just to blast a receivers because these microwave links have to avoid interference with one another and the FCC has to regulate their power. They are precisely engineered to cope with constant threats of environmental degradation in the form of shifting atmospheric events. They are not engineered to cope with additional manmade interference on top of that. And that is a point that the FCC never adequately addressed in the order as well. And again, I just want to close by pointing out that all of these issues can be addressed through AFC. AFC is the solution to making sure that these mission critical microwave links don't fail. I see my time is out. I do have a... Yep. No, most of my colleagues have any other questions. You're well over time. Thank you. Okay. Thank you very much. Yeah. Gentlemen, thank you all for your arguments today. The case is submitted.
judges: Tatel, Millett, Walker